IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF CHAUNCEY S. & HARLEY S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF CHAUNCEY S. & HARLEY S., JR., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

HARLEY S., SR., APPELLANT.

Filed February 25, 2025.   Nos. A-24-311, A-24-312.

Appeals from the County Court for Lincoln County: JOEL B. JAY, Judge. Affirmed.

Matthew D. Pederson, of Pederson Law Office, for appellant.

Kortnei Smith, Deputy Lincoln County Attorney, for appellee.

MOORE, BISHOP, and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Harley S., Sr. (Harley Sr.), appeals from an order of the county court for Lincoln County, sitting as a juvenile court, which terminated his parental rights to his children, Chauncey S. and Harley S., Jr. (Harley Jr.). Upon our de novo review of the record, we affirm the juvenile court's order.

## II. STATEMENT OF FACTS

### 1. EVENTS PRIOR TO CHILDREN'S REMOVAL FROM MOTHER'S CARE

Harley Sr. and Faith C. are the parents of Chauncey, born in March 2015, and Harley Jr., born in November 2015. Harley Jr. was born "extremely premature at approximately 22 weeks of gestation" and spent the first 3 years of his life living in hospitals or rehabilitation facilities. He

- 1 -

has been diagnosed with autism, is "developmentally delayed," and is "not very verbal," although by the time of the termination hearing he was expressing himself in very short sentences. During this case, Faith relinquished her parental rights to the children, and she is only referenced as needed for context.

In January 2019, the Nebraska Department of Health and Human Services (the Department) received a report that Faith was using marijuana in front of the children. At that point, Faith agreed to "work a non-court case with the Department," focusing on her drug use and the domestic violence in her relationships. Faith and the children lived in a shelter run by the Rape and Domestic Abuse Program (RDAP) for approximately 6 months after becoming involved with the Department. In approximately June 2019, they moved into "transitional housing" provided by RDAP.

Harley Sr. "did not sign a non-court agreement" with the Department. At the time the Department began working on the voluntary case with Faith, Harley Sr. was in jail for domestic assault against her. He had been sentenced to probation; however, his probation was revoked, and he was then incarcerated due to his failure to participate in Anti-Violence Program classes. While incarcerated, Harley Sr. received work release status. His work release was revoked, however, when he violated the terms of his work release by visiting Faith and the children at the RDAP house.

### 2. FIRST REMOVAL AND ADJUDICATION

On August 16, 2019, the Department conducted a welfare check on Faith and the children due to reports that Harley Jr. had "red dots or possible petechial bruising" around his temples and on his cheeks and a bruise. The Department worker who conducted the initial welfare check did not get a good look at Harley Jr. because Faith did not turn on the lights. Faith reported that Harley Jr. had a rash from medication. Law enforcement also conducted a welfare check later that day, identified the red marks as "a rash," and advised Faith to take Harley Jr. to the doctor. During a follow-up welfare check on August 19, Department workers identified the marks on Harley Jr.'s face as petechial bruising, and Harley Jr. was taken to the hospital. At the hospital, the doctor reported that the marks "were indicative of strangulation and child abuse."

On August 20, 2019, the State filed juvenile petitions alleging that Chauncey and Harley Jr. were within the meaning of Neb. Rev. Stat. 43-247(3)(a) (Reissue 2016), in that they were in a situation that was dangerous to life or limb or injurious to their health or morals. In the accompanying affidavits, the State outlined the circumstances described above and asked that the court place the children in the Department's custody. The court entered detention orders on August 20, finding that continuation of the children in the parental home would be contrary to their welfare and ordering that they be placed in the Department's temporary custody.

On September 10, 2019, Harley Sr. pled no contest to the allegations of the State's petitions. The juvenile court accepted his pleas and adjudicated Chauncey and Harley Jr. as children within the meaning of § 43-247(3)(a).

### 3. TERMINATION PROCEEDINGS

#### (a) Motion

On January 5, 2024, the State filed motions for termination of Harley Sr.'s parental rights to Chauncey and Harley Jr. The State alleged statutory grounds for termination under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and that termination of Harley Sr.'s parental rights was in the children's best interests.

#### (b) Hearing

A termination hearing was held before the juvenile court on February 20, 21, and 23, 2024. The court heard testimony from two Department case workers, a Department supervisor, various mental health care professionals, law enforcement personnel, and the foster mother. It also received various documentary exhibits into evidence.

##### (i) Case Plan Progress November 2019 Through September 2022

Kristin Kirby was the Department case worker from October 2020 through September 2022. Kirby reviewed Department court reports and case plans prepared by a prior case worker and testified about Harley Sr.'s progress under the goals of those case plans as well as the case plans developed during Kirby's time on the case.

The first Department court report and case plan prepared for Harley Sr. was dated November 4, 2019. The goals identified in the case plan included working on substance use, household relationships, domestic violence, and parenting skills. The goals in subsequent case plans did not change, except as noted below, due to Harley Sr.'s lack of notable progress. Services offered to Harley Sr. included drug testing via sweat patch and supervised visitation. The Department also recommended therapy to address Harley Sr.'s mental health, substance use, and relationship concerns. During the reporting period covered by the first case plan, Harley Sr. participated in drug patch testing, but there were "times when the patch fell off or [Harley Sr.] stated it fell off or he took it off." During that time, Harley Sr. consistently tested positive for THC, with only a few negative patches. Harley Sr. also participated in fully supervised visitation. The Department approved weekend visits, informally supervised by Harley Sr.'s mother, because Harley Sr. was "working out of town." The informally supervised visits ended when it was reported that Harley Sr. was disrespectful and undermined his mother in front of the children. Harley Sr. refused all other services offered during that period.

During the reporting period for the case plan dated July 10, 2020, Harley Sr. continued to participate in drug patch testing and supervised visits. In February 2020, he had a patch test positive for methamphetamine, cocaine, and THC. In March, a patch tested positive for THC. Harley Sr. refused some patches in April, but after that, he began to test negative. Harley Sr. participated in the visits that could be offered during the COVID-19 pandemic. He continued to refuse counseling, stating that he did not feel it was necessary and that he could maintain sobriety on his own.

The case plan dated February 16, 2021, was the first one prepared by Kirby. The only change to the case plan was the addition of a goal specifically targeting mental health. During this reporting period, Harley Sr.'s drug patch tests were mostly negative except for a positive patch test in January 2021. When confronted with the result of that patch test, Harley Sr. accused the family

support worker of having a sexual relationship with the children's mother, accused the Department of manipulating the results to keep his children away from him, and generally blamed everyone other than himself for the positive result. Given Harley Sr.'s behavior, the family support provider terminated the contract for the case, stating that they could not continue to work with him. The Department was able to find another family support provider. The Department did not have evidence of Harley Sr. participating in counseling, although he stated in a family team meeting that he was pursuing it. Harley sent some "inappropriate" texts and emails to Kirby during this reporting period, and the Department began communicating through Harley Sr.'s attorney rather than directly with Harley Sr. Visitation was semi-supervised during this period. Visits "were going okay," but there were reports that Harley Sr. was allowing the children to spend too much time using electronic devices and allowing Chauncey to play games that were "way above his age." These concerns were discussed with Harley Sr., but he did not feel it was an issue. At some point, Harley Sr. began Parent-Child Interactive Therapy with Chauncey, but that ended in February 2021 when Harley Sr. refused all services.

Harley Sr.'s participation in his case plan was similar for the reporting period covered by the court report dated September 21, 2021. Kirby noted that following the February 2021 review hearing, Harley Sr. stopped participating in all services other than supervised visitation. By June, Harley Sr. had resumed drug patch testing; results received by the Department were negative. Harley Sr. participated in random UA testing and had three positive results for alcohol in July. At the February review hearing, the court had ordered Harley Sr. to participate in the Anti-Violence Program, but he was not accepted into the program based on "his conversation [upon contacting the program]," his lack of accountability, and denial of violence in his relationships. Harley Sr. continued to allow the children to spend time playing video games during visits, and he would reward the children with "toys and things" even if their behavior was poor. Harley Sr. successfully completed the Circle of Security parenting class during this reporting period. He also scheduled a psychological evaluation although he continued to refuse individual counseling.

During the reporting period covered by the court report dated March 15, 2022, drug patch testing was discontinued, but Harley Sr. participated "fairly consistently" in random UA testing. He tested positive for THC on 12 UAs and had one negative result. Harley Sr. attended the first scheduled appointment of his psychological evaluation, but he canceled his second appointment, stating that his Medicaid was "no longer valid." When Kirby investigated, she learned that Harley Sr.'s Medicaid had lapsed because he refused to provide necessary information "to keep his Medicaid going." Harley Sr. continued to refuse individual counseling, but he did complete a parental capacity evaluation. Kirby noted similar ongoing concerns during visits to those in previous reporting periods, including Harley Sr. buying a lot of gifts and toys, allowing the children to play video games, and providing inconsistent consequences for Chauncey's behaviors.

During the reporting period covered by the court report dated September 20, 2022, Harley Sr. started individual counseling and was attending regularly. Visitation was going well, and Harley Sr. progressed to overnight visits with the children in a hotel. After that, visitation progressed to overnights in Harley Sr.'s home, and the Department provided intensive family reunification services. By October the children were placed in Harley Sr.'s care. Kirby testified that she did not agree with the decision to transition the children to the home of Harley Sr. and Nicole W. (his wife), even though Kirby had written a permanency letter supporting the decision.

According to Kirby, she felt that the children's therapist was pressuring the Department to reunify given the amount of time the children had been in care.

The Department transferred the case to a new case worker in October 2022, to give the children "a fresh start" and the family "the best opportunity to be successful." Kirby testified that throughout her time as the case worker, Harley Sr.'s interactions with the Department were "just very hostile and aggressive" and that there were times when Harley Sr. was "threatening" to Kirby and other case professionals. She opined, based on her education, training, experience, time on the case, and review of the documents created subsequently, that termination of Harley Sr.'s parental rights would be in the children's best interests.

*(ii) Case Plan Progress October 2022 Through Termination Hearing*

Jeff Brown was the Department case worker from October 2022 through the time of the termination hearing. Brown reviewed prior case plans and had a "case staffing" with Kirby after taking over the case, but he did not "go back and read everything" documented in the case because he wanted to "make [his] own impressions."

At the time of the children's reunification with their father in October 2022, Harley Sr.'s wife, Nicole W., and Harley Sr.'s son with Nicole were also living in the home on a full-time basis. Nicole had parenting time in the home with her two older children from a different relationship every other weekend. The family was participating in all services provided by the Department, including Intensive Family Reunification (IFR), counseling for Chauncey, and family support. Reports from family support workers were positive, and the family successfully completed IFR near the end of December 2022.

Soon after the children resumed school in January 2023, the Department began receiving phone calls from teachers with concerns about the children's behaviors. On January 11, a call made to the child abuse hotline alleged that Harley Sr. was being "rough" with the children and that there was domestic violence in the home. When Brown spoke with Harley Sr. about the hotline call, Harley Sr. denied the allegations. Another hotline call on January 14 alleged that there was "a lot" of domestic violence in the home, that one of Nicole's children was being verbally and physically abused, and that Chauncey and Nicole's older children had been "held by their feet and dangled over the stairs." A third hotline call on February 3, alleged that there was a bruise on Harley Jr.'s face and that Harley Jr. said it had been caused by Nicole. Another allegation was that Chauncey overheard Nicole tell Harley Jr. to tell his teachers that Chauncey caused the bruise.

The Department opened an investigation based on the three new hotline calls, and Chauncey and Nicole's older children were interviewed at the Bridge of Hope Child Advocacy Center. Harley Jr. was not interviewed because he is "pretty much nonverbal." During his interview, Chauncey reported being called a derogatory name by Harley Sr. and seeing Harley Sr. hit Nicole. Chauncey reported that Harley Sr. hits "pretty much everybody." One of Nicole's children reported that Harley Sr. hit her in the stomach; that he threw a piece of hard cardboard at Nicole; and that he hits her, her brother, and Chauncey. She also talked about Harley Sr. hanging her brother and Chauncey over the staircase when they were in trouble and locking her and Nicole in the bathroom by wedging a knife under the door. Nicole's other child talked about being terrified when Harley Sr. hung him over the staircase; Harley Sr. hitting everyone and throwing a walker at Nicole; and Harley Sr. calling him, his sister, and Chauncey derogatory names.

Based on the allegations and interviews, the Department again removed Chauncey and Harley Jr. from Harley Sr.'s care. When Brown spoke with Harley Sr. about the allegations, he denied any domestic violence, although he admitted hanging the children over the staircase, claiming that it was a game and that they were "having a great time." Brown also spoke with Nicole about the allegations, and she admitted that Harley Sr. had been "abusive" and "a little rough" with her and that she had been planning on leaving him.

The first court report and case plan prepared by Brown was dated March 20, 2023. The case plan included two goals, the first involving emotional health, mental health, substance use, and family health, with the second goal being parenting. During that reporting period, nothing was being done to address the substance use portion of the goal and drug patch testing was not being offered. With respect to the mental health portion of the goal, Harley Sr. was attending individual counseling, but according to Brown, the therapist reported that Harley Sr. missed more sessions than he attended. Brown discussed the Anti-Violence Program with Harley Sr., but he was unwilling to participate in that program. Harley Sr. did express his agreement to participate in anger management, but as of the March 2023 case plan, he had not done so. Brown recommended individual counseling for Nicole as well and family or marriage counseling for Harley Sr. and Nicole, but neither of those had occurred as of the time of the termination hearing.

The Department was offering family support to address the parenting portion of the goal, as well as supervised visitation. In April 2023, Harley Jr. began refusing to attend visits. When the family support worker arrived for transportation to visits, Harley Jr. would show his unwillingness to go by yelling, screaming, kicking, crying, and saying, "No, no, safe, home, no." He would immediately calm down when told he did not have to attend the visit. According to the foster mother's testimony, when Harley Jr. was refusing visits, his self-harming behaviors included biting, hitting, and kicking himself. In June, Chauncey also began not wanting to attend visits. Given Harley Jr.'s extreme behaviors and the recommendation of the children's therapist to "figure out how to reduce the . . . behavior that was triggering [the children's] . . . trauma response," the Department allowed visitation to stop. By July, the Department agreed to allow Harley Sr. to transport the boys unsupervised from Dunning, Nebraska, where they were placed, to his residence in North Platte, Nebraska, where the subsequent portion of the visit would be fully supervised. The children attended these visits, but they began to have increased behaviors. Chauncey began having night terrors, anxiety, and "fits," and Harley Jr. began "throwing more fits" and resumed defecating in his pants, a behavior that had stopped for over a month prior.

On July 30, 2023, the Department received an intake call, alleging that during one of the unsupervised transports, Harley Sr. and Nicole began to fight and slap each other while the children were in the back seat of the car. Chauncey was again interviewed at the child advocacy center, and he disclosed being in the car when Harley Sr. and Nicole had a verbal altercation. When asked about any physical component to the fight, Chauncey mentioned things that had happened to him previously and appeared to be "confusing all of the different trauma situations he had been in." When Brown discussed the incident with Harley Sr., he commented, "Couples fight, of course we fought," and stated that the altercation was verbal. After this incident, fully supervised visits resumed, which the children again refused to attend.

On September 3, 2023, law enforcement responded to the home of Harley Sr. and Nicole after a neighbor reported observing a woman yelling out the door for someone to call the police

before the woman was pulled back into the house. Upon arriving, law enforcement observed pictures "off the wall," a deep freezer that had been tipped over, and a "child's breakfast seat" on the floor, the result of an apparent altercation inside the house. When an officer contacted Nicole, she reported that both she and Harley Sr. had walked away from the house following a verbal altercation. Nicole indicated that Harley Sr. had taken their youngest child with him when he left, but she did not provide any further information.

The second court report and case plan prepared by Brown was dated September 11, 2023. The case plan goals did not change from the previous plan as Harley Sr. had not made any progress toward meeting the goals. Brown testified to his belief that the progress in the case had "gone backwards." There was some progress with respect to Harley Sr.'s participation in individual therapy. In July 2023, he had been missing counseling sessions and his therapist reported that she was planning to refer him to another provider. By August or September, however, he was attending and cooperating with his therapist. During this reporting period, Harley Sr. still had not taken any type of anger management class and Nicole had stopped participating in any services offered by the Department. Harley Sr. was refusing to attend family support sessions, or if he did attend, he would state that he had nothing to work on.

Visitation between Harley Sr. and the children had not been occurring, and at some point, based on conversations with and the recommendation of the children's therapist, the Department determined to move to therapeutic visitation. A supervised visitation was allowed in November, however, for Harley Jr.'s birthday. The family support worker reported that the visit "went fine," but subsequent reports from the foster mother indicated that Chauncey experienced anxiety and night terrors both the night before and the night after the visit and that Harley Jr. exhibited increased behaviors around the time of the visit. According to Brown, anytime there was a decrease in visitation or no visits, there was a matching decrease in the children's trauma response behaviors. The children have not had any visits with Harley Sr. since the November visit. Following a December 19, 2023, hearing, the juvenile court ordered therapeutic visitation at the discretion of the children's therapist. As of the date of the termination hearing, Chauncey's current therapist had not yet recommended starting therapeutic visitation as Chauncey had repeatedly told her he was not ready; this same therapist determined in January 2023 that she could also work with Harley Jr., but she had not started doing so at the time of the termination hearing.

According to Brown, there were no services the Department could provide the family to work toward reunification beyond those that had already been provided. Brown opined, based on his years of experience, training, education, and contacts with the family, that termination of Harley Sr.'s parental rights would be in the children's best interests.

Brown's supervisor, Melissa Smith, testified about a safety assessment conducted by the Department on the family at the end of January 2024. The assessment showed "active safety threats," specifically, that Harley Sr. cannot meet the basic needs of Chauncey and Harley Jr. Based on the safety concerns shown by the assessment, the Department did not recommend that the children be placed back at home. Smith agreed that the Department had exhausted all possible services that could be provided to the family. Based on her years of experience, training, and education, Smith believed that termination of Harley Sr.'s parental rights would be in the children's best interests.

*(iii) Evaluations Completed*

Harley Sr. partially completed a psychological evaluation with licensed psychologist, Dr. Lee Kimzey, in September 2021. Kimzey noted concerns with Harley Sr.'s behaviors and mood stability and made provisional diagnoses of "[u]nspecified disruptive, impulse-control, and conduct disorder" and "[u]nspecified episodic mood disorder." At trial, Kimzey testified that his diagnoses were based on the clinical interview but were considered provisional because Harley Sr. did not complete the necessary testing.

Kimzey conducted a psychological evaluation of Chauncey in September 2023. Kimzey diagnosed Chauncey with generalized anxiety disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder (ADHD), and a persistent motor or vocal tic, as well as an unspecified depressive disorder. Kimzey testified that a child with diagnoses like Chauncey's would need stability, consistent support, and a comfortable and safe environment to thrive. Kimzey also testified that if Chauncey were to be placed into an environment of domestic violence his anxiety would "continue to progress." Kimzey expressed concerns about how a parent diagnosed with impulse control issues would react to the stress presented by a child diagnosed with ADHD or significant anxiety. Kimzey expressed similar concerns about a parent diagnosed with impulse control disorder parenting a child with autism.

In March 2022, licensed clinical psychologist, Dr. Gage Stermensky, conducted a parenting capacity evaluation of Harley Sr. Stermensky diagnosed Harley Sr. with unspecified personality disorder, ADHD, and "did a rule out" for unspecified cannabis disorder and unspecified alcohol use disorder, which means that "more information is needed." Stermensky recommended that Harley Sr. participate in anger management and individual counseling. At trial, Stermensky noted that Harley Sr. never acknowledged the role his past behaviors could have played in his children's trauma. Stermensky testified that at the time of his evaluation, he had concerns about returning the children to Harley Sr.'s care based on his lack of demonstrable progress across treatment plans, indicating that his underlying issues have not been resolved.

*(iv) Therapy Provided*

Janice Sherman, a licensed independent mental health practitioner, began providing therapy for the children in June 2021. Within about a month, she began family therapy sessions that included Harley Sr. and Nicole. The family therapy sessions focused on addressing the children's past family trauma experiences and Harley Sr.'s bond with Harley Jr. Harley Sr. actively participated in family therapy with Sherman from approximately mid-2021 to October 2022 when the children were returned to Harley Sr.'s care. Sherman continued to provide therapy for Chauncey (eventually via telehealth visits) through February 2023 when the children were again removed from Harley Sr.'s care. Harley Jr. began another type of therapy targeted to his autism needs in the summer of 2023, and he was no longer eligible for the services provided by Sherman. Sherman wrote a letter to Brown, dated October 5, 2023, addressing her concerns with the children's behaviors around visitation with Harley Sr. She noted that the children had had a "consistent pattern of difficulty with sleep, nightmares, anxiety, and somatic symptoms such as stomachaches and headaches" when told of upcoming visits with Harley Sr. By that time, a new local therapist had been located for Chauncey, and in her letter, Sherman recommended therapeutic visits. Sherman testified that given how long the children have "been in a state of limbo," they

need safety, consistency, stability, and predictability. She also testified that permanency is in the children's best interests, and she stated, "All children need that."

Maria Hall, a provisionally licensed mental health practitioner, began providing individual counseling for Chauncey in October 2023. Chauncey's initial diagnostic interview testing showed he had mild to moderate depressive symptoms, PTSD, moderate symptoms of anxiety, and that he was at a high risk for toxic stress. During their therapy sessions, when appropriate, Hall would ask Chauncey if he was ready to have visits with Harley Sr. Generally, Chauncey replies that he is not ready to do so. At the start of a session in January 2024, Chauncey told Hall, "I thought of something, I want to kill my dad." When Hall asked Chauncey what made him have "those feelings or thoughts," Chauncey responded, "Because of all the things he did to us," and he specified, "Hit, spank, slap, like Mom." Chauncey has expressed to Hall on more than one occasion a fear of returning to Harley Sr.'s care and has shown increased behaviors as the termination hearing approached. Hall expressed concerns about returning Chauncey to Harley Sr.'s care in the near future, and she testified to her belief that it would be in Chauncey's best interests to have his father's rights terminated and to be provided permanency as soon as possible.

Jennifer Spencer, a licensed independent mental health practitioner and licensed alcohol and drug counselor who specialized in trauma work, has been providing individual therapy for Harley Sr. periodically throughout this case. She noted that "the original urgent needs" was in June 2019, but Harley Sr. did not "come back right away." He returned in September 2019 and Spencer did a co-occurring evaluation for substance use and mental health in October. Spencer testified that she then worked with Harley Sr. for a period until around November 2020, after which she did not work with him again until July 2022. She has been seeing Harley Sr. consistently since that time. In their recent sessions, Spencer has been working on helping Harley Sr. handle his anger better. They have also worked on understanding the impacts of trauma on a person's coping mechanisms. Harley Sr. has been willing to discuss with Spencer and work on how his own trauma has impacted his children's trauma. According to Spencer, Harley Sr. has been "very open to understanding how trauma affects kids and childhood." She indicated that he has progressed from feeling like he did not need therapy to being someone "who's engaged, who wanted to understand, who wants to change, who wants to stop the cycle." Spencer indicated, however, that trauma therapy "can take years for some people." She agreed that children need permanency and consistency.

### (c) Orders

On April 10, 2024, the juvenile court entered orders terminating Harley Sr.'s parental rights to Chauncey and Harley Jr. The court found clear and convincing evidence of grounds for termination of Harley Sr.'s parental rights under § 43-292(2), (6), and (7). The court also found clear and convincing evidence that termination of Harley Sr.'s parental rights was in the children's best interests and that the State had rebutted the presumption of parental fitness as to Harley Sr.

### III. ASSIGNMENTS OF ERROR

Harley Sr. assigns that the juvenile court erred in (1) granting the State's motion for termination parental rights pursuant to § 43-292(2), (6), and (7) and (2) finding that Harley Sr. was an unfit parent and that it was in the children's best interests to terminate his parental rights.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

### 1. STATUTORY GROUNDS

Harley Sr. assigns that the juvenile court erred in granting the State's motion for termination of parental rights pursuant to § 43-292(2), (6), (7). The court found clear and convincing evidence to terminate Harley Sr.'s parental rights under all three grounds. Upon our de novo review, we find that the State presented clear and convincing evidence to support termination of Harley Sr.'s parental rights under § 43-292(7). Proof of one statutory ground is needed for termination, and the record clearly shows that statutory grounds for termination of his parental rights exist under § 43-292(7).

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

The children were removed from their mother's care and placed in the Department's custody on August 20, 2019. The children have been in out-of-home placement continuously since that time, except for the 4 months that they were returned to Harley Sr.'s care between October 2022 and February 2023. At the time the motion for termination of parental rights was filed, the children had been out of the home for more than 15 months of the most recent 22 months. At the time of the termination hearing, the case had been open for 59½ months, and the children had been in out-of-home care for 55½ months. As noted by the juvenile court in the termination order, the children have been in an out-of-home placement "for more than three times the 15 month marker in total." Our de novo review of the record clearly and convincingly shows that grounds for termination of Harley Sr.'s parental rights under § 43-292(7) were proven by sufficient evidence.

The juvenile court also found sufficient evidence to support termination under § 43-292(2) and (6), but we do not need to consider whether termination of Harley Sr.'s parental rights was proper pursuant to those subsections since § 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. (T66-T69, T76). See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). However, we will consider evidence relevant to § 43-292(2) and (6) in our analysis of best interests. Generally, when termination of parental rights is sought, the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of J'Endlessly F. et al.*, 26 Neb. App. 497, 920 N.W.2d 858 (2018).

## 2. BEST INTERESTS AND UNFITNESS

Harley Sr. assigns that the juvenile court erred in finding that he was an unfit parent and that it was in the children's best interests to terminate his parental rights.

In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). The best interests and parental unfitness analyses in the context of a termination of parental rights case require separate, fact-intensive inquiries, but each examines essentially the same underlying facts. *Id.*

In its analysis, the juvenile court noted testimony from Department personnel and evidence from the children's guardian ad litem that termination of Harley Sr.'s parental rights was in the children's best interests. The court also noted the testimony of the various mental health providers in this case that permanency and consistency were also in the children's best interests. Harley Sr. argues that the court erred in allowing the Department case workers and supervisor to provide opinions as to the children's best interests over his objections. However, Harley Sr. did not assign error to the admission of this testimony. See *Evert v. Srb*, 33 Neb. App. 244, 13 N.W.3d 728 (2024) (alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court). He also challenges the weight and credibility of certain testimony, but the juvenile court clearly accepted the State's evidence over Harley Sr.'s and we defer to its determinations in that regard. See *In re Interest of Denzel D., supra*.

The juvenile court also addressed the issue of parental unfitness, observing that the children in this case "were not growing up in a safe and healthy environment when living with their father." The court noted Harley Sr.'s incarceration for domestic violence against the children's mother when this case began and his refusal throughout most of this case to address the domestic violence issues or acknowledge any responsibility for how his negative actions have affected the children. The court noted Spencer's testimony that Harley Sr. has experienced trauma in his own life and that he has grown more open to working through this trauma. The court stated, "That is certainly something that [Harley Sr.] should do for the sake of any other children or stepchildren that would be in his home." The court noted, however, the length of time this case has been open, and it observed that Harley Sr. "could still make changes, but that has not happened, and it is unknown if it ever will." The court concluded that, at this time, Harley Sr. is unfit to parent the children in this case.

Our de novo review is consistent with the juvenile court's review of this case. Harley Sr. argues that the court should not have focused on the domestic violence issues at the start of the case with the children's mother, with whom he no longer has a relationship. Harley Sr.'s arguments ignore the domestic violence that occurred subsequently in his relationship with Nicole and the violence committed directly against the children that clearly had adverse effects on the children.

Harley Sr. clearly loves the children and is to be commended for reaching a point in therapy where he is willing to work on his own trauma and to acknowledge the possible traumatic effects of his own actions on the children. However, it is also clear that his trauma therapy may take many years to complete. And, at the time of the termination hearing, despite the recommendation and court order for therapeutic visitation, such visitation had not yet begun. Chauncey was still unwilling to see his father, and the record also clearly reflects an increase in the children's behavioral issues any time contact with Harley Sr. has increased. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). We conclude that the State showed by clear and convincing evidence that Harley Sr. was unfit, and that termination of his parental rights was in the children's best interests.

## VI. CONCLUSION

For the reasons set forth above, we affirm the juvenile court's order terminating Harley Sr.'s parental rights to Chauncey and Harley Jr.

AFFIRMED.